## Theodore PLANTS *v.* TOWNSEND CURTNER LUMBER Co. et al.

5-5037                                     448 S. W. 2d 349

### Opinion delivered December 22, 1969

[Rehearing denied January 26, 1970.]

*Hodges, Hodges & Hodges* and *John Norman Harkey,* for appellant.

*Riddick Riffel,* for appellees.

CARLETON HARRIS, Chief Justice. This is a workmen's compensation case. Theodore Plants, appellant herein, contends that he was permanently disabled as a result of an accidental fall which he suffered in the course of his employment on April 16, 1965. Plants was a timber cruiser for Townsend Curtner Lumber Company in Newport, and was injured when he tripped on a root in the woods, and fell. A claim was filed which was heard by a referee on May 10, 1966. The referee

found that a compensable injury had been sustained on April 16, 1965, but that no compensalble time was lost as a result of the injury, and he held Plants had failed to show that any disability he held at the time of the hearing was the result of this accident. The claim for compensation benefits was denied, and on appeal to the full commission, at which time further evidence was heard, that tribunal held that under the state of the record the decision of the referee was correct, and should be affirmed. The commission added, however, in effect, that certain medical evidence had been introduced which could mean that claimant might possibly have a compensable injury, but found that it would require a surgical myelogram to reveal this fact. Whereupon, the commission withheld its opinion until communicating with the attorney for claimant, in order to determine whether Plants desired to have the myelogram. Claimant reported in the affirmative, and was sent to Dr. John H. Adametz, a neurosurgeon of Little Rock, who examined Plants on July 24, 1967. Adametz made an examination, took a myelogram, and reported his findings. After receiving this report, the commission affirmed the referee's opinion as correct, finding ''that claimant is suffering from a multitude of ailments and conditions, but the evidence does not establish that claimant's present disability resulted from his accidental injuries on April 16, 1965.'' This finding was appealed to the Woodruff County Circuit Court, and was affirmed. From the judgment so entered, appellant brings this appeal.

Of course, we are primarily interested in determining whether there was substantial evidence to support the finding of the commission. Plants testified that, following the injury, his left elbow immediately began to swell, and the arm turned black in the vicinity of the elbow. He reported to his supervisor, and was sent to see Dr. Jackson, a physician of Newport. Jackson took X-rays, administered shots, and issued a prescription. Subsequently, according to Plants, further X-rays were taken, and he was given pain tablets. Thereafter, Plants

saw Dr. Weatherford, a chiropractor of Newport, and claimant was given some chiropractic treatments. Plants went to Weatherford for four or five weeks, until the first part of July, though continuing to report for work, and continuing on the payroll; he did not, however, make any more trips to the woods, but stayed around the office. Claimant testified that he asked W. T. Arnold, the supervisor, to take him off the payroll on August 4, because he (Plants) could not continue to work. Subsequent to the last visit to the chiropractor, claimant went to see Dr. John D. Ashley, Jr., of Newport.

In November of 1965, Plants entered the Veterans Administration Hospital,[1] and was discharged on February 14, 1966. Appellant stated that the attending physicians at the Veterans Administration advised that they were not able to make a diagnosis, and they desired to send him to Memphis, specialists being there available that were not available in Little Rock. He said that the Memphis hospital did not have a bed available at the time, and he was asked (by the Veterans Administration, Little Rock) to consent to the taking of a myelogram. This was done, but, according to claimant, two or three days later, he was again requested to authorize a second myelogram. Plants said that he first authorized it, but later changed his mind, since he felt that he was in worse shape than he had been when he first arrived. He was then advised by one of the doctors that the Memphis unit refused to accept him because he would not agree to the myelogram. Appellant said that Dr. Ashley recommended against having another myelogram.

Arnold testified that he remembered Plants' reporting the injury to him, and recalled that claimant's left arm was considerably swollen. The witness stated that Plants had been physically capable of performing the duties required of him up to the time of the injury,

[1]Plants testified that he was discharged from the Army in February, 1919, with a diagnosis of arthritis of the spine.

and that employment was terminated on August 4, 1965, when appellant told him that he (Plants) was not capable of physically performing the duties required of him. Arnold said that the employment of Plants after the accident was pretty well confined to riding around in a truck, instructing a replacement who was being acquainted with the job. The supervisor added that he knew that Plants did not get around as well as he did prior to the fall. It was stipulated that L. L. McAdams and Henry Latner, if called as witnesses, would testify that they worked with Plants prior to the date of the accident, and that he had been physically capable of performing all duties of his employment, but that he had not been capable of performing these duties after April 16, 1965. It was further stipulated that John W. Lewis and William Lewis would testify to the same facts.

Dr. Ashley testified that Plants "had process that resembled rheumatoid arthritis in his neck and shoulders, and acute bursitis;" also, "he had a markedly elevated blood uric acid, which led us to establish a diagnosis of gout." X-rays revealed healing fractures in the third and fourth ribs on the right, and there was some deformity of the left elbow which Ashley considered due to a previous dislocation of the elbow. The witness testified that he prescribed ACTH, a preparation used in the treatment of gout, and also indocin, another drug used for the relief of pain in gout and arthritis. The witness said that originally there had been a dislocation of the left elbow, fractures of the ribs, and a neck injury, and that Plants had considerable stiffness and soreness, with some swelling of the small joints of the fingers and wrists; appellant also complained of pain in the ankles and feet, but the doctor observed no swelling. Dr. Ashley explained that gout is a metabolic disease, the origin of which is little understood, and "is characterized by a failure of the kidneys to eliminate uric acid in the normal acid." He said that Plants was not capable of doing physical work, and when asked if he held an opinion as to the cause of the gout, responded:

"As I stated a moment ago gout is a metabolic disorder which may exist in a quiescent form for a number of years and very often it is precipitated by an injury sometimes it is a fairly trivial injury which will precipitate the symptoms of gout and once it is precipitated the symptoms will persist for a long period of time in spite of treatment."

He then added:

"I feel that his injury on the 16th of April, 1965, was the direct cause of the gout occurring at that time."

Dr. Ashley admitted that the diagnosis of gout did not explain all of appellant's complaints about his hands, his feet, his back, and his cervical region, and he stated that the total picture was considerably confused, because of the possibility of muscular dystrophy or perhaps even a spinal cord tumor. He also said it was possible Plants might have some undiagnosed neurological disease. Dr. Ashley testified that, when he first made the diagnosis of gout, the disease was in the acute phase. but that phase had terminated (at the time of his testimony), and had terminated within three or four weeks after August. The residuals of gout suffered by the claimant were soreness and stiffness in the muscles, and fatigue, which the doctor said could be caused by something other than gout. He also testified that arthritis is one of the symptoms of this disease. The witness stated that Plants' gout is a permanent condition. While Ashley had been of the opinion in August that there was no permanent disability because of the gout, the doctor stated that he had changed his opinion, because "he hasn't gotten well"—however, the uric acid count had gone back down.

Dr. Alfred Kahn, of Little Rock, examined Plants, and submitted a summary of his findings. The report is rather lengthy, but it is interesting that under the heading, "impressions," he made mention of sixteen

ailments.[2] Dr. Kahn concluded his report by stating:

" 'In summary, this portion of the patient's work-up indicates to me that the differential diagnosis with regard to the patient's discomfort in his upper extremities and chest lies between trauma to the neck as a result of his fall and some type of muscular or spinal dystrophy of idiopathic origin which is entirely unrelated to his fall; in order to make this diagnosis, I feel that a neurosurgical consultation is most necessary, and that a cervical myelogram is most likely necessary. But I would leave this point up to the neurosurgeon. If the cervical structures are entirely normal, then it would be my opinion that the degenerative process in the patient's hands is entirely unrelated to his fall on April 16, 1965.

" 'There are a number of other important facets of this patient's health which should be reviewed at this time.

" 'First of all, this patient has cardiovascular disease and arteriosclerotic heart disease. His electrocardiographic tracing is quite abnormal and suggests more than hypertension; it suggests moderately severe coronary disease. The patient does not describe any symp-

---

[2](1) History of fall resulting in fractures of the right third and fourth ribs and injury to the left elbow on April 16, 1965.
  (2) Syndrome of muscle degeneration of both hands.
  (3) Arteriosclerosis, general.
  (4) Coronary artery sclerosis.
  (5) Defective vision.
  (6) Deafness, mild.
  (7) Edentula.
  (8) Osteoarthritis.
  (9) Deformity of the duodenum.
  (10) Pulmonary fibrosis.
  (11) Atrophy of right testis.
  (12) Gout.
  (13) Hypercholesterolemia.
  (14) Nephrosclerosis, benign.
  (15) Hypothyroidism.
  (16) Hypertensive cardio-vascular disease.

toms which could be ascribed to his coronary disease or to his high blood pressure, such as smothering or angina.

\* \* \*

" 'Reference has been made to the fact that this patient has gout and it probably is correct. On the other hand, I doubt that gout in any way explains this patient's pain syndrome other than a very mild degree. It is also true that gout may be precipitated by trauma but gout seems rather far afield from the patient's clinical picture at this time even though he does have some manifestations of gout.

" 'Of particular metabolic interest is the fact that the patient's blood cholesterol is 385 Mg.%. A cholesterol this high goes along with a low thyroid and, in addition to this, it is an accelerating factor in coronary artery sclerosis. A low fat diet and thyroid would do much to reduce this in all probability. An effort should be made in this direction.

" 'The other findings in this patient's case are of less importance. He probably has a benign nephrosclerosis, as there is some albuminuria. There is some pulmonary fibrosis. There is a moderate deformity of the duodenal cap and the second part of the duodenum. There is some atrophy of the right testis.

" 'In summary, this patient has a pain syndrome associated with atrophy of his hands. The differential diagnosis lies between a neck injury sustained in his fall and an idiopathis disorder of the muscles and/or muscles and spine entirely unrelated to his trauma. In my opinion, the gout and the other factors do not play a significant role in explaining his pains. On the other hand, this patient has many disorders entirely unrelated to his fall which do have an effect on his health and, in some instances, should be treated as noted above.

" 'I strongly urge a neurosurgical consultation and

a cervical myelogram if it is deemed advisable by the neurosurgeon.' "

A report from Dr. Thomas M. Fletcher, Jr., was also made a part of the record. This report was not nearly so comprehensive as the testimony of Ashley and the report of Kahn; the doctor said that whether claimant's condition was a result of his fall could not be determined with certainty, though such a possibility did exist. The principal finding of Fletcher was that to complete a neurological examination, it would be necessary that a cervical myelogram be performed. He also said that it would be desirable to make an electromyelographic study and additional spinal fluid studies should be obtained.

As previously pointed out, the commission suggested that Plants be given another myelogram, and he consented for this to be done by Dr. John H. Adametz. Dr. Adametz, after describing the results of the physical examination, then reported:

" 'A complete myelogram was performed, which showed the cervical cord to be of normal size, without any evidence of enlargement, indicating tumor or atrophy. There was some posterior ridging at C3 through C7 from arthritic ridging, but no evidence of actual extrusion of the disc material. There was some minimal posterior bulging at L4-5 and L5-S1 levels.

" 'None of these myelographic findings were significant to account for the atrophy in the patient's hands. It was noted definitely on examination that pressure over the wrist on the volar side aggravated the discomfort in his fingers and palms.

" 'The myelogram was done on July 26, 1967, and the patient was kept in the hospital following the myelogram for a two-day period of observation, to let him

recover from this study. He was discharged from the hospital on July 28, 1967.

" 'It was my impression that this patient had a bilateral carpal tunnel syndrome, causing pressure on his median nerves bilaterally, but more marked on the right. I feel that his symptomatology could well be alleviated, as far as his hands are concerned, by a surgical procedure to open up the carpal tunnels. He did show some degenerative arthritic changes in the neck and lower back, but this would be in keeping with his stated age of 68 years. I could find no relationship between his findings as far as his hands were concerned and the described trauma that he reported to me as having occurred on April 16, 1965. The compression syndrome of the median nerve, which we refer to as a carpal tunnel syndrome, is one of a gradual narrowing of the canal through which the median nerve passes at the wrist, and this is also seen as part of the aging process, and not related to trauma. This patient has considerable problems of degenerative disease, such as generalized arteriosclerosis, generalized osteoarthritis, but I can see no relationship between the described trauma and these natural aging processes.' "

Claimant objected to the submission of this report for the reason that it was not verified as required by statute; whereupon, the report was verified. Claimant further objected to the report for the reason that the physician was to perform a cervical myelogram, and, says appellant, the examination was to be restricted to that test. Instead, Adametz made a general examination, including history, physical findings, and extensive conclusions, which appellant contends were not warranted, in view of the fact that he was merely to perform a cervical myelogram.

As stated at the outset, we are only called upon to determine whether there was substantial evidence to support the finding of the commission, and, as stated

in *Reynolds Mining Company* v. *Raper,* 245 Ark. 749, 434 S. W. 2d 304, handed down December 2, 1968:

"* * * It must be kept in mind that the question is not whether the testimony would have supported a contrary finding, but whether it supports the finding made. The Commission's decision should not be reversed unless the proof is so nearly undisputed that fair-minded men could not reach the conclusion arrived at by the Commission."

Actually, had the commission held to the contrary, we would doubtless have affirmed. Appellant insists that the testimony of Dr. Ashley was definite, while the testimony relied upon by appellee, particularly that of Dr. Kahn, was somewhat indefinite. In *Georgia Pacific Corporation* v *Craig,* 243 Ark. 538, 420 S. W. 2d 854, we made a comment which is pertinent to appellant's argument. Quoting from an earlier case, *American Life Insurance Company* v. *Moore,* 216 Ark. 44, 223 S. W. 2d 1019, we said:

"Appellant insists that Dr. Monroe's testimony is speculative, since he admitted the possibility that death was due to some other cause. But medicine, like the law is not an exact science. If mathematical certainty were required, a surgeon would act at his peril in advising his patient to undergo an operation. The law does not compel adherence to a standard so precise. The effect of Dr. Monroe's testimony is that in his opinion the most probable cause of death was a pulmonary embolism attributable to the fractured leg."

We added:

"Here, though unable to pinpoint the work, or the exact number of overtime hours that would have contributed to the heart attack, Dr. Regnier, like Dr. Agar, gave his best opinion after acquainting himself with the history and the facts deemed pertinent. Doctors are ex-

perts in their field, and as pointed out in *Dorman*, it is for that reason that they are permitted to express an opinion."

The commission chose to take the view expressed by Kahn and Adametz, and we certainly cannot say that there is no substantiality to their evidence.

It is asserted that the commission erred in admitting into evidence, over the appellant's objection, the report of Dr. Adametz. Appellant contends that Dr. Adametz, in performing the myelogram, was confined to only giving a report of his findings in that connection, but instead, the doctor rendered a report making extensive findings and recommendations not connected with the taking of the myelogram. It is also asserted that Dr. Adametz did not make the report to the commission until nearly six months after his examination, and that this delay affects the credibility of his report. It is further contended that appellant had no opportunity to cross-examine the doctor. We do not agree. As to the first assertion, the commission has authority upon its own initiative to cause a medical examination to be made, and take whatever action it deems proper for the protection of all parties. Ark. Stat. Ann. § 81-1319(i) (Repl. 1960). As to the delay in sending the report, there is no explanation in the record, but certainly we can see no prejudice to either party thereby. Finally, with reference to the contention that appellant's counsel had no opportunity to cross-examine Dr. Adametz, we can only say that the record does not reflect that counsel made any request to this effect. The report was objected to on the grounds that it was not verified,' and that Dr. Adametz went beyond his authorization, but no objection was made that appellant was being deprived of the right of cross-examination. We cannot find error on the part of the commission for failing to allow cross-examination when it was not asked to do so.

---

'The report was thereupon verified.

We hold that there was substantial evidence to support the commission finding, and no prejudicial error was committed.

Affirmed.