## ROYAL SHOE MANUFACTURING COMPANY
### *v.* SYLVIA ARMSTRONG

5-5953                                              481 S.W. 2d 737

### Opinion delivered July 3, 1972

*Riddick Riffel,* for appellant.

*Sam Boyce,* for appellee.

FRANK HOLT, Justice. Appellee filed a claim for workmen's compensation benefits alleging that she was totally

and permanently disabled because of residuals suffered from a cut on one of her fingers. The Commission found that appellee had suffered a 25% functional disabilty to the body as a whole and further determined that, based upon appellee's age, education and type of work history, she was entitled to a 50% permanent partial disability to the body as a whole. From an affirmance of this award by the Circuit Court, appellant brings this appeal asserting for reversal that the award is not supported by substantial evidence.

Appellee, a widow, testified that she was 47 years of age and had a tenth grade education. She had worked at the shoe factory since 1964 and had never held a job which did not require the use of her hands. She cut a finger in the performance of her duties and was off from work a week. She received medical attention at this time because her hand became red and swollen, her arm hurt, and she could hardly use her injured right hand and arm. When she returned to work, she continued to perform her normal duties without assistance although the pain persisted and required medical aid. About a month later she had to quit work because "it just kept getting worse and it got to where I couldn't use that arm and fingers *** it got to where I couldn't even use that hand and my arm." She was off from work from October 10, 1967, until March 13, 1968.

During this time she saw four different doctors. She received treatment for her condition which was diagnosed as causalgia. Her "fingers jerked all of the time when it was cold they turn blue looking." There was poor circulation. The doctor injected stellate ganglion block in her neck to relieve the radiating spasm and pain. She, also, continued taking other medication. She has suffered pain constantly since August 8, 1967 (the date of the injury). Upon her return to work on March 13, 1968, she was assigned a different job which required her to pick up boxes. She could do this with her unimpaired fingers on her left hand. Since the accident she is unable to pinch, grasp, or claw with the injured hand. She does not have the same strength in her injured right hand as she does in her left hand. Eventually she was assigned

to other job duties requiring the use of her fingers, and she was unable to accomplish the tasks. A few days later, which was in March, 1969, the appellant was "laid off" from her job. Prospective employers would not hire her when they learned about her physical impairment, and she was unable to find "something for a handicapped person." The physical pain has persisted and medication does not completely relieve it. She takes "nerve pills" to prevent "jerking" or spasms which wake her, and she becomes "sick at my stomach" when the "jerking" reaches up into her arm, shoulder, neck, and ear. She has a loss of function in her shoulder. Appellee's testimony was corroborated by her relatives and co-workers.

Appellee's medical expert testified to having treated her on numerous occasions. The initial examination occurred on January 5, 1968. He diagnosed her condition as a disorder known as causalgia. Causalgia is a chronic disorder involving the blood vessels usually of an extremity, and it is characterized by spasm of the blood vessel, coldness of the extremity, and often severe pain, numbness, and usually a profound interference with the function of the extremity. It is caused by a reflex disorder of the nervous system. The initiating cause is practically always an injury, a fracture or crushing injury, and sometines a relatively trivial injury will initiate the process. Appellee's injury was to the first joint on the right hand; therefore, the part of the nervous system involved was a peripheral nerve which supplies the skin and muscle. The condition is often relieved by a stellate ganglion block. This procedure must be done repeatedly. Appellee underwent this treatment approximately six times. These treatments resulted in rather dramatic improvement for a short period of time.

He further testified that initially she had considerable limitation of motion in the right shoulder. In February she had about 70% range of motion with a good pulse in the radial artery. In March, 1968, her condition was diagnosed by him as causalgia of the right forearm, upper arm and shoulder and bursitis of the right shoulder. The bursitis was probably a result of the other injury. He stated it was difficult to separate the pain and say which one was caused by the bursitis and which one was a result of causalgia. Both, however, were a result

of the initial injury. He felt the bursitis was the result of the cut knuckle, because she kept her arm immobilized because of pain and disability and immobilization at the shoulder joint for a period of several weeks or several months very often will result in a frozen shoulder syndrome. He couldn't say whether burisitis was a direct result of the injury or whether it was simply a "fellow traveler." A frozen shoulder is the result of something, some disease process or some traumatic process rather than a medical disease of its own. Causlgia follows any type of injury and bursitis could result from trauma. In this case, the bursitis could be just "a fellow traveler." In his opinion appellee's frozen shoulder resulted from the injury rather than the bursitis.

Appellant was treated by this doctor on numerous occasions. By August 7, 1968, appellee's condition had improved greatly. However, she still complained of a problem with her fingers. He thought that inasmuch as this problem was probably functional in origin, it would probably disappear with use upon returning to work. At this time, he felt that her wage earning ability was not materially impaired. Appellee was treated again in April, 1969. At that time she told him she had had thrombophlebitis of the right forearm (this apparently began in February and appellee received treatment from another physician). In April there were no clinical symptoms of thrombophlebitis; however, the return of the causalgia the second time was probably due to the thrombophlebitis but no one could tell whether or not the thrombophlebitis was the result of any particular episode including the cut. On cross-examination the medical witness testified, as abstracted, "I cannot say to a reasonable degree of medical certainty that the return of the causalgia [in 1969] was a result of the earlier causalgia or the cut in the finger." However, on re-direct, he stated, "if she had never had the original injury, she would never have had causalgia, and she would never have had the return of it." The last time he had a record of examining her was on June 17, 1969, when he found no recurrence of the thrombophlebitis, and he based his evaluation "strictly" on the causalgia and predicated her disability upon causalgia. At that time she was complaining of continued pain in the right forearm and partial paralysis of two fingers, and, also,

frequent attacks of muscle spasms in her fingers, forearm, shoulder, with the pain radiating up the right side of her head. Upon examination he found weakness with no loss of motion in the right forearm and fingers and with inability to grasp small objects; some spasm in the blood vessels; coldness of the extremity; and a small degree of atrophy of the right forearm due to disuse. She could not perform the basic hand functions; grasp, pinch and claw, with her injured hand and fingers. According to him, Dr. Ashley, she had a 25% permanent disibility to the body as a whole.

In evidence is a letter written on November 6, 1967, by another physician who had examined appellee. He wrote:

"***It is my impression that Mrs. Armstrong has a minor causalgia of the right hand, which should respond quite well to a few stellate ganglion blocks. She is of an anxious type personaltiy and if she does not watch out, the right shoulder will become frozen, or show marked limitation of the motion of the shoulder and for this she needs exercise, ultrasonic heat, etc.***"

This letter further stated that he recommended that appellee have further treatments. This doctor saw appellee approximately two months later (December 26, 1967), and he described her condition as:

"She continues to have pain in her right hand with associated weakness. She further has some increasing stiffness in the right shoulder and states that now the pain is going up to the base of her neck into her head and she has headaches."

He indicates in this letter that appellee was undergoing stellate block treatments and recommended a neurological evaluation.

In support of its contention for reversal, appellant argues that Dr. Ashley's medical testimony is insufficient to support his conclusions that appellee suffered any

permanent disability nor is there any other evidence to sustain the Commission's finding and awarding appellee a 50% permanent partial disability to the body as a whole as a result of the original injury. We cannot agree.

This court recognized in *Qualtiy Excelsior Coal Co.* v. *Maestri,* 215 Ark. 501, 221 S.W. 2d 38 (1949), that a "claimant is not required to establish proof of the cause of the death to a mathematical certainty, but when the probable cause of death is established to a reasonable certainty, the burden of proof has been discharged." Likewise, in the case at bar, appellee need only establish to a reasonable certainty that her disability was caused by the cut on her finger. In *Plants* v. *Townsend, Curtner Lbr. Co.,* 247 Ark. 824, 448 S.W. 2d 349 (1969) we quoted:

> "It must be kept in mind that the question is not whether the testimony would have supported a contrary finding, but whether it supports the finding made. The commission's decision should not be reversed unless the proof is so nearly undisputed that fairminded men could not reach the conclusion arrived at by the commission."

Furthermore, in *Wilson & Co.* v. *Christman,* 244 Ark. 132, 424 S.W. 2d 863 (1968), we said:

> "The Workmen's Compensation Commission is charged with the duty and the full responsibility of deciding *all claims for disability* falling under its jurisdiction, and although its decisions are based on competent evidence, it is not limited, and never has been limited, to *medical evidence only* in arriving at its decision as to the amount or extent of permanent partial disability suffered by an injured employee as a result of injury. The Commission should consider *all competent evidence,* and where the claim is for permanent partial disability based on *incapacity to earn,* the Commission should consider all competent evidence relating to such incapacity, including the age, education, experience, and other matters affecting the claimant's incapacity to earn the same wages he was receiving at the time of his injury. The Commission

should form its opinion and base its award on the preponderance of all the competent evidence, including medical, as well as lay testimony, and also including the testimony of the claimant himself***."

We further reiterated:

"The opinions of attending physicians and medical experts are admissible as competent evidence when properly presented in a compensation case, but such opinions are not conclusive. They are only to be considered by the Commission along with all other competent evidence, medical and otherwise, in arriving at the degree of permanent partial disability in a compensation case."

See, also, *Dacus Casket Co.* v. *Hardy,* 250 Ark. 886, 467 S.W. 2d 713 (1971).

In the case at bar the evidence is not limited to the medical testimony. When we review all of the evidence in the light most favorable to the finding of the Commission, as we must do on appeal, we cannot say that there is an absence of any substantial evidence to support the Commission as fact finders.

Affirmed.